# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

          **Plaintiff,**

**v.**

NEIL R. COLE and
SETH HOROWITZ,

          **Defendants.**

---

**COMPLAINT**

**Civil Action No. 19-CV-11148**
**ECF CASE**
**(Jury Trial Demanded)**

---

Plaintiff, the United States Securities and Exchange Commission ("SEC"), for its Complaint against defendants Neil R. Cole and Seth Horowitz, alleges as follows:

## OVERVIEW

1.  This case concerns a fraud perpetrated by Defendants Neil R. Cole and Seth Horowitz to manipulate revenue and earnings metrics at the company where they were top executives, publicly traded brand management company Iconix Brand Group, Inc. ("Iconix"), through round-trip transactions with a joint venture partner.

2.  Cole, the company's founder and then-CEO, devised the scheme, which was simple:  Cole negotiated with a joint venture partner to artificially inflate the price that the partner would pay to Iconix for intellectual property assets.  Cole promised that Iconix would give back the overpayments, and Cole and Horowitz worked to find ways to paper over these givebacks so that they would look legitimate.  A $5 million overpayment in the second quarter of 2014 and a $6 million overpayment in the third quarter of 2014 – neither of which should have been recognized as revenue in light of the promise to give the funds back – enabled Iconix to

1

beat Wall Street analysts' consensus estimates for revenue in each quarter, and enabled Iconix to beat Wall Street expectations for revenue and a key earnings per share metric when Iconix reported its annual results for 2014. Cole and Horowitz reviewed calculations of how much revenue would be needed to beat quarterly expectations, collaborated on how to structure the giveback payments, and worked together to coordinate payments using sham invoices.

3.    Although Horowitz was involved in negotiating the third quarter deal and collaborated with Cole on the structure of both deals, it was Cole who negotiated the key aspects of each deal, agreed on final terms, signed the deal documents, and authorized payments to the joint venture partner. Both Cole and Horowitz improved their compensation and realized substantial profits from trading in company stock as a result of their fraud. When an SEC inquiry related to Iconix's accounting practices began in December of 2014, Cole directed that Iconix respond with false and misleading statements meant to conceal the scheme, and at Cole's insistence, both he and Horowitz deleted relevant emails in order to obstruct any investigation that might occur.

4.    By engaging in the misconduct described herein, Cole and Horowitz violated the antifraud, reporting, books and records, and internal accounting control provisions of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act").

5.    Cole and Horowitz will continue to violate the federal securities laws unless restrained or enjoined by this Court.

6.    The SEC seeks injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and 28 U.S.C. § 1331.

8.      Venue is proper in this Court pursuant to Section 22(a) and (c) of the Securities Act [15 U.S.C. § 77v(a) and (c)] and Section 27(a) and (b) of the Exchange Act [15 U.S.C. § 78aa(a) and (b)], because certain of the acts, practices, and courses of conduct constituting the violations alleged herein occurred within the Southern District of New York.

9.      Each defendant, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## DEFENDANTS

10.      Neil R. Cole, age 62, resides in New York, New York.  Cole served as the Chief Executive Officer of Iconix Brand Group, Inc., from 1991 until August, 2015, when he left the company during the course of its internal investigation into allegations of the misconduct at issue in this complaint.  At all times relevant to this Complaint, Cole also served as Chairman of the Board and President of Iconix.

11.      Seth Horowitz, age 43, resides in New York, New York.  Horowitz began working at Iconix in 2012 and served as Chief Operating Officer of Iconix from March 2014 until he resigned in April 2015.

## I.      BACKGROUND

A.    **The Iconix Business Model**

12.    **Iconix Brand Group, Inc. ("Iconix")**, is a publicly-traded company incorporated in Delaware and headquartered in Manhattan.  Iconix has a class of shares registered under Section 12(b) of the Exchange Act, and its common stock trades on the Nasdaq Global Market under the symbol "ICON."  Iconix's predecessor company, Candie's Inc. ("Candie's"), was previously charged by the SEC in two actions.  In 2003, the SEC charged Candie's with violating Exchange Act Section 10(b) for fraudulent recognition of revenue through the use of improper bill-and-holds and artificial inflation of revenue by entering into illusory sales transactions with a barter company, and Candie's settled the charges.  Cole was charged, among other things, with causing Candie's violations of Section 10(b), and settled the charges, paying a $75,000 penalty. In 1996, the SEC charged Candie's with violating Securities Act Section 5 [15 U.S.C. § 77(e)] in connection with a scheme to evade the registration requirements with respect to four offerings, and Candie's settled the charges.

13.    Iconix engages in licensing, marketing, and providing trend direction for its brand portfolio and, at its peak, held over 1,100 licenses with retailers and manufacturers worldwide.

14.    Iconix has referred to its business model as "asset light."  Under its stated business model, Iconix owns brand trademarks and related intangible assets, but leaves design, manufacturing, distribution, warehousing, and retailing to its licensees, which pay royalties and other fees to Iconix for the right to use the Iconix brand names.

15.    During the relevant period, Iconix publicly described the formation of international joint ventures as a "key initiative in the Company's global brand expansion plans."

16.     Beginning as early as 2011, certain of Iconix's core licensees experienced significant financial distress due to a loss of customer demand for the brands that they licensed from Iconix and an inability to sell branded merchandise.

17.     As a result, by 2013, certain of Iconix's licensees were delinquent in their royalty payment obligations to Iconix, and at least one licensee was on the verge of bankruptcy.

18.     The inability of Iconix's licensees to sell products associated with the brands and to make royalty payments negatively impacted Iconix's ability to continue to recognize royalty revenues and to maintain previously recorded accounts receivable as assets.

19.     In turn, this negatively impacted Iconix's ability to meet earnings estimates, as well as its ability to continue to recognize the intellectual property assets as unimpaired.

20.     Cole and Horowitz knew all of this, as they regularly received and reviewed documents setting forth the company's financial results and projections for the future.

**B.      Applicable Accounting Standards**

21.     As a U.S. public company, Iconix was required to report its financial results for each quarter, and on an annual basis to report its results for the full year.  During the relevant period of 2013 through 2015, the practice at Iconix was to issue a press release soon after the end of each quarter announcing financial results, which would then be filed with the SEC on the online EDGAR system.  Shortly thereafter, Iconix would also report its financial results on a Form 10-Q, which it filed on the SEC's EDGAR system.  Iconix also filed an annual report and annual financial statements on Form 10-K.  In addition to making these filings available to the public on EDGAR, Iconix would make them available on the Iconix website.

22.     As a U.S. public company, Iconix was required to compile and report its financial results in accordance with Generally Accepted Accounting Principles, or "GAAP."

23.    GAAP is a combination of authoritative standards (set out by policy boards including the Financial Accounting Standards Board, or "FASB") and the commonly accepted ways of recording and reporting accounting information.

24.    GAAP standardizes and regulates the definitions, assumptions, and methods used in accounting across industries, and seeks to ensure that a company's financial statements are complete, consistent, and comparable.  This makes it easier for investors to analyze and extract useful information from the company's financial statements and facilitates the comparison of financial information across different companies.

25.    FASB's Accounting Standards Codification ("ASC") is the current source of U.S. GAAP.

26.    One of the financial results Iconix announced each quarter was revenue.

27.    ASC 605, *Revenue Recognition*, in relevant part, provides guidance for transaction-specific revenue recognition and certain matters related to revenue-generating activities, such as the sale of products and rendering of services.  Pursuant to ASC 605, revenue is recognized when it is realized or realizable and earned.  In addition, ASC 605 provides guidance for (i) arrangements under which a vendor will provide multiple deliverables to a customer; (ii) reporting revenue gross or net of certain amounts paid to others; (iii) accounting for consideration given by a vendor to a customer; and (iv) the use of the milestone method in arrangements that include research or development deliverables.

28.    Pursuant to and consistent with ASC 605's guidance that revenue should not be recognized until it is realized or realizable and earned, Iconix's revenue recognition policy set forth four requirements that must generally be met before revenue can be realized and earned: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been

rendered; (iii) the seller's price to the buyer is fixed or determinable; and (iii) collectability is reasonably assured.

29.     Iconix also announced its earnings per share each quarter.  Iconix reported its "Basic EPS," a GAAP measure, which is computed by dividing net income by the weighted average number of common shares outstanding for the reporting period.  But Iconix also reported in its quarterly earnings press releases a non-GAAP measure, "non-GAAP diluted earnings per share" (hereinafter "EPS"), which involves making certain adjustments to net income and counting stock options and the like toward the total of shares outstanding.

## II.     COLE'S SCHEME TO MANIPULATE REVENUE AND EARNINGS

### A.     Pressure to Beat Quarterly Revenue and Earnings Estimates

30.     Multiple securities analysts covered Iconix and wrote research reports on the company's performance and future prospects.  For each quarterly reporting period, analysts would estimate what they predicted Iconix would report for quarterly revenue and EPS.  The analysts' estimates, taken together, formed the "consensus" estimate for Iconix.

31.     Cole and Horowitz paid close attention to how Iconix's performance placed it with respect to these metrics.

32.     Throughout 2014, Cole and Horowitz regularly received and reviewed financial forecast documents which set out Iconix's actual projected financial results for the current quarter and year and compared those projected results to the consensus estimates for revenue and EPS.

33.     These financial forecast documents also identified potential revenue from joint venture initiatives under consideration in that quarter.

34.     The financial forecast documents compared the contribution each joint venture initiative would make toward Iconix's reported revenue and EPS, and identified whether Iconix would meet the consensus estimates with and without use of the joint venture initiatives.

35.     Cole and Horowitz knew that, given the manner in which Iconix routinely accounted for its joint venture activities, if Iconix could sell assets to a joint venture, then Iconix's practice would be to immediately book as revenue the purchase price, less Iconix's cost basis in the assets, as long as Iconix received at least 20 percent of the purchase price at the time of the transaction.

36.     In the second quarter of 2014 and again in the third quarter of 2014, Iconix was at risk of not meeting consensus estimates for revenue and EPS.  Cole and Horowitz knew this, because they regularly reviewed the financial forecast documents prominently displaying this information.

37.     In order to close the gap and meet or beat consensus estimates, Cole devised a scheme to get a joint venture partner to pay inflated purchase prices for two intellectual property sales to the joint venture, with the resulting overpayment pushing Iconix over the line to beat consensus revenue estimates for each of the two quarters.

38.     The joint venture at issue had been established in the third quarter of 2013 by Iconix and Company 1, a brand management company headquartered in Asia and with offices in New York.  Company 1 held multiple licenses for Iconix brands, and had done business with Iconix in the past.  The joint venture was formed to distribute items bearing Iconix brands in Southeast Asia, and was known within Iconix as the Southeast Asia or "SEA" joint venture.

39.     In the second and third quarters of 2014, Company 1 agreed to overpay for the intellectual property because Cole agreed – in secret, oral side deals – to give the overpayments

8

back to Company 1 at a later date.  Cole promised that Iconix would find ways to return the
overpayments and conceal their nature, such as by calling them payments for marketing and
similar services, when in fact Iconix would simply be giving money to Company 1.  In both
transactions, Company 1 was set to pay the purchase price in installments over time, with only
20 percent of the full price due at closing.  As a result, this meant that Company 1 did not bear
the cost of the overpayment up front.

**B.      The Second Quarter "SEA II" Round-Trip Inflated Revenue and Non-GAAP
Diluted EPS**

40.      In the second quarter of 2014, the consensus estimates from analysts were that
Iconix would report quarterly revenue of over $117 million, and EPS of $0.67 when the quarter
ended on June 30.  Based on financial forecasts that Cole and Horowitz reviewed on a regular
basis throughout the quarter, Iconix was not on track to meet those metrics.

41.      As a result, Cole and Horowitz were considering several initiatives involving
sales of Iconix intellectual property as a way of bumping up revenue and EPS.

42.      For example, Company 1 and Iconix executives, including Cole and Horowitz,
had been negotiating an amendment to the SEA joint venture that involved Iconix selling certain
intellectual property rights to the joint venture.

43.      The parties discussed a $10.9 million purchase price.  The $10.9 million purchase
price was consistent with a fair market valuation calculated internally by executives at Company
1, and Cole and Horowitz had been discussing a $10.9 million purchase price for the assets with
executives at Company 1 in April and May of 2014.  Deal documentation was prepared on the
basis of a $10.9 million purchase price.

44.      But according to the financial forecast documents reviewed by Cole and
Horowitz, the revenue Iconix would receive from selling the intellectual property at its fair

market value of approximately $10.9 million would not be enough for Iconix to meet consensus revenue estimates.

45.     Consequently, between on or about June 18 and on or about June 27, 2014, Cole determined that the purchase price must be increased by $5 million, to $15.9 million, and Cole negotiated the increase.  Company 1 ultimately agreed to this increase.

46.     Before finalizing the transaction, no valuation was prepared at Iconix or Company 1 that would justify a purchase price of $15.9 million.

47.     Cole negotiated this deal and the purchase price increase with executives of Company 1.  Cole promised Company 1 that if Company 1 paid $15.9 million for the intellectual property valued at $10.9 million, then Iconix would give back the $5 million overpayment at a later time.  One of the methods for returning the money that was later discussed was by using the guise of a payment for marketing services.

48.     The marketing services arrangement was a sham.  Neither Cole nor Horowitz ever had a written agreement with Company 1 to provide marketing services related to this transaction.  At the time the SEA II transaction was entered, no marketing services were specified, let alone services that would add up to $5 million.

49.     Cole intended to give back to Company 1 the $5 million overpayment.  Later, the return payments by Iconix were called payments for "marketing services" merely for accounting purposes.  Cole intended the $5 million figure to match the overpayment that Iconix was receiving, not to reflect the value of any services provided by Company 1.

50.     In the time period during which the deal was being negotiated, Horowitz was in regular communication with Cole as to how much revenue Iconix needed to meet its objectives, and how the SEA II deal could be structured.  When the SEA II deal was complete, Horowitz

understood the reason for the $5 million overpayment and that Cole had promised to return the money to Company 1.

51.    After Cole promised that Iconix would give back the $5 million overpayment, Company 1 agreed to a final purchase price of $15.9 million.

52.    Cole and Horowitz then had the deal documents revised to update the purchase price from $10.9 million to $15.9 million.  Because the substance of the deal had not otherwise changed, the only term that they had changed was price.

53.    The SEA II deal was finalized on June 30, 2014, the last day of the second quarter.

54.    Cole signed the contracts on behalf of Iconix.

55.    At the time the deal closed, Company 1 paid Iconix 25 percent of the inflated purchase price, or $4 million.

56.    Iconix recognized a second quarter gain of $13.6 million on the transaction, representing the difference between the consideration received and the book value of Iconix's interest in the brands contributed to the joint venture.

57.    Of this, $5 million should not have been recognized, as Iconix had promised to return it via round-trip.  Consequently, under the relevant accounting standards and Iconix's accounting policies, it was not permissible to recognize the $5 million overpayment as revenue.

58.    On July 29, 2014, Iconix issued a press release announcing its second quarter results, and filed the press release with the SEC the same day as an exhibit to a Form 8-K.  The press release described Iconix's results in a materially false and misleading manner.

59.     The title of the press release was "Iconix Brand Group Reports Record Revenue and Earnings for the Second Quarter of 2014," and just below that, Iconix touted "Record Q2 revenue of $118.9 million and non-GAAP diluted EPS of $0.75."

60.     This revenue figure was false, because it had been materially inflated due to the $5 million overpayment.

61.     The press release reported non-GAAP diluted earnings per share of $0.75, beating the consensus estimate of $0.67 by eight cents per share.  If the false revenue from the SEA II deal had been excluded, then Iconix would have reported $0.69 per share, only two cents over consensus.

62.     The SEA II transaction was described in a materially misleading fashion in Iconix's Form 10-Q, filed with the SEC on or about August 6, 2014.  Cole signed the false and misleading Form 10-Q.

63.     Cole also signed a required certification under Section 302 of the Sarbanes-Oxley Act of 2002, which was filed as an exhibit to the Form 10-Q.  Cole falsely certified, among other things, that the quarterly report did not suffer from material misstatements or omissions, that the financial statements fairly presented the results of the company, that he had ensured an effective system of internal control over financial reporting, and that he had disclosed all fraud.  Because he knew of the fraudulent SEA II round-trip transaction that had been used to artificially inflate revenue and EPS, all of Cole's certifications were false.

64.     Cole also signed a required certification under Section 906 of the Sarbanes-Oxley Act, also filed as an exhibit to the Form 10-Q.  Cole certified that the financial results had been prepared in accordance with Section 13(a) of the Exchange Act, and that they fairly presented the

company's results.  Again, Cole knew these certifications were false because revenue had been manipulated.

65.     The Form 10-Q falsely reported revenue of over $118.9 million for the quarter. The consensus revenue estimate for Iconix was just over $117 million, meaning that because of the $5 million in bogus revenue from the SEA II transaction, Iconix beat the analysts' consensus estimate by $1.86 million.  If Iconix had excluded the $5 million from the SEA II transaction that it had promised to give back to Company 1, Iconix would have reported revenue of approximately $113.9 million, and therefore would have fallen short of the consensus estimate by over $3.1 million.  This meant that revenue was overstated by 4.4 percent.

66.     In the Form 10-Q, Iconix reported net income after taxes for the quarter of over $38.78 million.  Excluding the impact of the $5 million of bogus revenue from the SEA II deal, net of the effect of taxes, would have resulted in actual net income of approximately $36.38 million, meaning that Iconix's net income for the second quarter was inflated by over 9 percent.

67.     In its Form 10-Q, Iconix also described the trademark rights transferred to the SEA joint venture as part of the SEA II deal, and claimed that: "In return, [Company 1] agreed to pay [Iconix] $15.9 million," which was materially false and misleading because it failed to disclose that only $10.9 million was paid as consideration for the trademark rights, with $5 million representing an agreed-upon overpayment, lacking in economic substance, that Cole had promised to send back to Company 1.

68.     This materially false and misleading statement was repeated in Iconix's annual report filed on Form 10-K on March 2, 2015, which Cole signed.

69.     This materially false and misleading statement was repeated in Iconix's Form 10-Q for the first quarter of 2015, filed on May 8, 2015.  Cole signed the quarterly report as well as two false Sarbanes-Oxley certifications.

**C.      The Third Quarter "SEA III" Round-Trip Transaction Inflated Revenue and Non-GAAP Diluted EPS**

70.     In the third quarter of 2014, which ended on September 30, it appeared as though Iconix would miss its targets for revenue and earnings.  The analysts' consensus estimates were about $111.8 million for quarterly revenue, and EPS of $0.63.  Throughout the quarter, Cole and Horowitz reviewed financial forecast documents projecting that Iconix would fall short of those targets.

71.     Consequently, Cole and Horowitz were again considering joint venture initiatives as a way to realize one-time gains and hit their financial metrics.

72.     One of the joint venture initiatives was the sale of additional intellectual property assets to the SEA joint venture.  This transaction, referred to by some within Iconix as "SEA III," resulted in a second amendment to the SEA joint venture agreement.

73.     Horowitz was extensively involved in negotiating the transaction, and he kept Cole informed of the negotiations through frequent email and in-person updates.

74.     Cole personally negotiated key elements of this transaction as well as the final terms.

75.     Cole, Horowitz, and executives at Company 1 had discussed a deal in which Company 1 would pay Iconix $15.5 million for the intellectual property assets.

76.     This $15.5 million purchase price matched a fair market valuation calculated internally at Company 1, and was the purchase price that Cole and Horowitz had been discussing with executives at Company 1.

14

77.     Cole determined that the purchase price must be increased by $6 million, to $21.5 million, in order for Iconix to beat its consensus revenue estimate.

78.     Prior to this deal, no one at Iconix or Company 1 had prepared valuations that would justify a $21.5 million purchase price.

79.     In or about the first half of September, 2014, Cole negotiated a $6 million increase to the purchase price.  In an oral side deal, Cole promised that if Company 1 overpaid for the assets by $6 million, then Iconix would return $6 million to Company 1.

80.     Cole, Horowitz, and executives at Company 1 discussed that one of the ways that Iconix could give back $6 million would be by enabling Company 1 to prematurely terminate a particular license with Iconix to sell children's apparel, which would reduce the royalty fees Company 1 would owe to Iconix.  Horowitz worked with Cole to develop this proposal.

81.     During the negotiations, Horowitz gave executives at Company 1 a draft agreement terminating the children's apparel license.

82.     At Cole's direction, Horowitz worked with lawyers to finalize the deal documents which reflected the $21.5 million purchase price for SEA III.

83.     The deal documents did not reflect Cole's promise to give $6 million back to Company 1.  That promise was never reduced to a written agreement.

84.     The SEA III transaction was executed on September 17, 2014.  Cole signed the contract on behalf of Iconix.

85.     At the same time the deal closed, Company 1 paid Iconix 20 percent of the inflated purchase price, or $4.3 million.

86.     On or about September 30, 2014, Iconix recorded an $18.7 million gain on the transaction, representing the difference between the $21.5 million purchase price and the book

value of Iconix's interest in the assets contributed to the joint venture.  Of this gain, $6 million should not have been recognized, as Iconix had promised to return it via round-trip. Consequently, under the relevant accounting standards and Iconix's accounting policies, it was not permissible to recognize the $6 million overpayment as revenue.

87.     On October 28, 2014, Iconix issued a press release announcing its third quarter results.  The press release was filed with the SEC the next day, October 29, 2014, as an exhibit to a Form 8-K filing.

88.     The press release contained materially false and misleading statements.  The press release touted that Iconix had achieved "[r]ecord Q3 diluted non-GAAP EPS of $0.73, a 23% increase over prior year quarter."  This was materially false and misleading because the EPS metric had been manipulated.

89.     Reporting non-GAAP diluted EPS at $0.73 enabled Iconix to beat the consensus estimate of $0.63 by ten cents.  If Iconix had excluded the effect of the bogus $6 million in revenue from its EPS calculation, then its non-GAAP diluted EPS would have been $0.65 cents – only two cents over the consensus – and not the record high touted in the press release.

90.     The press release also touted the achievement of "[r]ecord Q3 revenue of $113.8 million, a 6% increase over prior year quarter," which was false and misleading in light of the $6 million in false revenue recognized in the third quarter.

91.     The press release also reported net income for the quarter of $37.2 million, up from the same period the year before, and net income for the first nine months of 2014 of $138.8 million, also up considerably from the same period in 2013.

92.     Cole was quoted in the press release as stating that "[o]ur strong third quarter and year to date results reflect the continued strength of our overall portfolio and the power of our

business model." Cole did not state that performance had been overstated through the inclusion of bogus revenue. Cole attributed the "strong third quarter and year to date results" in part to "double digit growth around the world driven by our global brands and joint ventures," but omitted to state that an international joint venture with Company 1 was being used as a way to manufacture fake revenue.

93.     These materially false and misleading statements were repeated in Iconix's quarterly report for the third quarter, filed with the SEC on Form 10-Q on November 7, 2014, and signed by Cole.

94.     Cole also signed the same required Sarbanes-Oxley certifications identified above in paragraphs 63-64, falsely certifying that the quarterly report complied with section 13(a) of the Exchange Act, fairly presented the financial results of the company, and was free of material misstatements or omissions, and that Cole had disclosed material facts to the auditors, insured an effective system of internal control over financial reporting, and had disclosed any known or alleged fraud. Because he was concealing the fraudulent SEA II and SEA III round-trip transactions, Cole knew that each of these certifications was false.

95.     In its Form 10-Q, Iconix touted quarterly revenue and other metrics that were falsely inflated by the SEA III transaction. The third quarter report touted "Record Q3 revenue of $113.8 million," and "Gain related to the sale of . . . trademarks in the Greater China territory to our Iconix Southeast Asia joint venture" as two of three "Highlights of Current Quarter."

96.     In the Form 10-Q, Iconix falsely reported approximately $113.8 million in revenue for the quarter, and $348.8 million in revenue for the year-to-date. By reporting false revenue, Iconix was able to meet the analysts' consensus revenue estimate of approximately $111.8 million by $1.94 million. Revenue for the quarter was inflated by over 5 percent.

97.     Iconix reported $37.2 million in after-tax net income, and $138.8 million in net income for the year-to-date.  If the $6 million SEA III overpayment were deducted from revenue and adjusted for the effect of taxes, actual net income would have been reported as a little over $34 million, meaning that net income for the third quarter was overstated by over 12 percent.

98.     The third quarter report repeated the same false description of the SEA II transaction that was included in the second quarter report.  The Form 10-Q also described the trademark rights transferred to the SEA joint venture as part of the SEA III deal, and claimed that: "In return, [Company 1] agreed to pay [Iconix] $21.5 million," which was misleading because it failed to disclose that $6 million of this total represented an agreed-upon overpayment, lacking in economic substance, which Cole had promised to send back to Company 1.

99.     This materially false and misleading statement was repeated in Iconix's 2014 Annual Report, submitted on a Form 10-K filed on March 2, 2015, and again in its Form 10-Q for the first quarter of 2015, filed on May 8, 2015.  Both reports were signed by Cole, as well as the required Sarbanes-Oxley certifications.

**D.     Iconix's 2014 Financial Statements Were False as a Result of Defendants' Fraud**

100.     As a result of Defendants' revenue recognition fraud, Iconix made false and misleading statements when reporting its 2014 financial results.

101.     First, on February 26, 2015, Iconix announced its 2014 results in a press release, which it filed the same day as an exhibit to a Form 8-K.

102.     The press release quoted Cole, who was "pleased with our performance in 2014."

103.     The first item touted in the press release was revenue, reportedly up 7 percent from the year before.  Iconix reported annual revenue of over $461 million, beating the consensus revenue estimate of over $459 million by about $1.4 million.  This was misleading,

because if the bogus $11 million in revenue from the SEA II and SEA III transactions had been

deducted, Iconix would have reported about $450 million in revenue, meaning the company

would have missed consensus estimates by about $9.59 million.  Given the importance placed on

meeting or beating consensus estimates, this was a material misstatement.

104.     The next item touted was non-GAAP diluted earnings per share, up 16 percent

from 2013.  Iconix reported non-GAAP diluted EPS of $2.78 for the year, beating the analyst

estimate of $2.76 by two cents.  This was also misleading, because if the sham SEA II and SEA

III overpayments had been excluded from revenue, and if a bogus $3.1 million payment,

discussed below, had been excluded from expenses, Iconix would have reported non-GAAP

diluted EPS of $2.74, missing the analysts' consensus estimate by two cents.  Given the

importance placed on meeting or beating consensus estimates, this was a material misstatement.

105.     On March 2, 2015, Iconix issued its 2014 financial statements, filed as part of

Iconix's 2014 annual report on a Form 10-K.

106.     Cole signed the false financial statements.

107.     Cole also signed false Sarbanes-Oxley certifications, with the same certifiations

as set forth in paragraphs 63-64 above.

108.     The annual financial statements repeated the false revenue number from the press

release, claiming that Iconix had achieved revenue of over $461 million for the year.  Cole

signed the financial statement despite knowing that $11 million in revenue had been fraudulently

recognized as a result of the round-trip SEA transactions.

E.     **Cole and Horowitz Worked to Facilitate Payments to Company 1 in the Fourth Quarter of 2014**

109.     On September 26, 2014, in an effort to collect the SEA II overpayment that Cole

had promised to give back, Company 1 sent three invoices to Iconix, totaling $5 million.

110.    Although the $5 million total exactly matched the amount of the SEA II overpayment, the invoice amounts were greatly in excess of the value of the marketing services to which they purported to relate.

111.    The invoices were suspicious, among other things, because they were for large, round numbers, were payable upon receipt, and contained little description of any services rendered.  In addition, one of the invoices related to marketing for a brand that was unrelated to the SEA joint venture.

112.    By contrast, bona fide joint venture invoices typically were for non-round amounts corresponding to the actual value of services rendered, were not payable on receipt, and contained a description specifying that a verifiable service had been rendered.

113.    Moreover, the $5 million in invoices were for services not memorialized in any written agreement.

114.    After the invoices were brought to his attention, Cole directed Horowitz to obtain new invoices that addressed the suspicious red flags identified above.

115.    Cole and Horowitz communicated with executives at Company 1's New York offices, requesting new invoices.

116.    After these requests, on October 2, 2014, Company 1 issued new invoices for the same purported services.  In the new invoices, Company 1 made slight changes to the amounts (to avoid round numbers), added some detail to the services description, and changed the invoice dates to September 30.

117.    By late November 2014, Iconix had not paid the invoices.

118.    Cole and Horowitz communicated with each other and with executives at Company 1, in meetings and via email, about how to repay the money Cole had promised would be returned to Company 1.

119.    On November 17, 2014, Horowitz informed Cole by email that he had processed some of the Company 1 invoices.

120.    On November 25, 2014, Iconix paid $1,940,230 to Company 1 via electronic transfer.  Cole approved the transfer.  The invoice associated with the payment was one of the invoices Company 1 first presented on September 26, and that Company 1 later amended to add detail, change the invoiced amount, and change the invoice date to September 30.

121.    Then on December 10, 2014, Iconix paid $955,710 to Company 1 via electronic funds transfer.  Cole signed the transfer instructions.  Again, the invoice associated with the payment was one of the invoices first presented on September 26, then later amended to add detail and change the invoiced amount and date.

122.    On December 17, 2014, Iconix paid Company 1 a total of $2,467,340 via multiple electronic transfers.  The transfers were approved as one group, and Cole signed the transfer instructions.  There was no written agreement related to any of the services described in the invoices, and the invoiced amounts greatly exceeded the real value of any of the services described in the invoices.  Rather, the invoices were meant merely to paper over Iconix's payments of amounts due to Company 1 pursuant to the agreements negotiated by Cole.

123.    All together, these payments totaled over $5.3 million.

124.    The third invoice that Company 1 had sent to Iconix on September 26 had been reissued on October 2 under a different amount, $2.1 million.  Iconix rejected the invoice in

21

December 2014.  That invoice purported to be for marketing services unrelated to the SEA joint venture.  When Iconix rejected the invoice, Company 1 wrote it off its books.

125.    Though Iconix had drafted a termination agreement for Company 1's children's apparel license, Iconix ultimately did not terminate the agreement.

126.    Cole also negotiated a new joint venture with Company 1, through which the two companies would distribute certain Iconix-branded merchandise in the Middle East, Europe, and North Africa regions.  The deal, known within Iconix by the acronym "MENA," closed on December 24, 2014.

127.    Cole personally negotiated the terms of the MENA deal with Company 1, including in the week before the deal was executed.

128.    As part of the MENA deal, Company 1 purchased an interest in a joint venture called Iconix MENA for about $18.8 million.  In connection with that transaction, Cole negotiated a written agreement with Company 1 whereby Iconix would give $3.1 million to Company 1 in the form of "consulting fees" for a purported due diligence and marketing analysis of the Middle East and North Africa markets.

129.    At Cole's direction, Horowitz helped finalize the deal documents.

130.    The $3.1 million payment was grossly disproportional to the true value of any due diligence or market analysis.  In short, the $3.1 million due diligence contract was merely a vehicle for simply giving $3.1 million to Company 1, rather than a legitimate business expense.

131.    On December 23, 2014, Cole authorized Iconix to pay Company 1 $3.1 million for "ME JV formation costs," and payment was made.

F.     **After Iconix Received the SEC Comment Letter, Cole Obstructed the Inquiry Through False Responses and Destruction of Evidence**

132.     On December 15, 2014, Iconix received a comment letter from the SEC's Division of Corporation Finance, as part of a filing review of the company's 2013 annual report. In its letter, Corporation Finance inquired about certain accounting and reporting matters, including Iconix's accounting for international joint ventures such as those at issue in this case. Cole led the process of formulating the company's written response. On February 11, 2015, as part of the comment letter process, Corporation Finance sent Iconix another letter seeking additional information about international joint ventures, including the SEA and MENA joint ventures.

133.     Cole led a group of Iconix officers and employees, including Horowitz, who worked on formulating a written response to the Corporation Finance inquiry, which the company sent on February 24, 2015. Horowitz drafted certain language in the response and Cole made or directed that certain edits be made. At Cole's direction, both Defendants contributed to the final, false and misleading language of the Iconix response letter.

134.     Cole and Horowitz knew Iconix's response to the comment letter would be made publicly available. The company's response letter was posted on the SEC's EDGAR website.

135.     In its February 11, 2015 comment letter, the Division of Corporation Finance had asked Iconix to "further explain to us the primary business purpose" of certain international joint venture transactions, to "clearly explain the circumstances that lead to" each transaction, and to "describe the circumstances leading to a decision to enter into each transaction, and identify the individual(s) who is responsible for negotiating and executing these transactions."

136.     At the direction of Cole, the Iconix response was misleading. Iconix's response letter listed reasons for entering the second quarter SEA II deal, but omitted the role played by

23

the $5 million overpayment that enabled Iconix to fraudulently boost revenue, or Cole's promise to return $5 million to Company 1. Similarly, the response letter described the intellectual property assets that Iconix contributed to the joint venture, and stated that in return, Company 1 "agreed to pay [Iconix] $15.9 million," which misleadingly omitted that only $10.9 million of the purchase price was consideration for the intellectual property, with the remaining $5 million constituting an overpayment that Cole had promised to give back.

137.   In addition, in order to insulate Cole from scrutiny, the Iconix response falsely stated that the SEA II deal was "negotiated by" Horowitz "with guidance from CEO, Neil Cole." This was misleading because, as set forth above, Cole was instrumental in negotiating the overpayment and giveback elements of this deal.

138.   At Cole's direction, the Iconix letter provided a similarly misleading response as to the third quarter SEA III deal, omitting the $6 million overpayment from the list of reasons Iconix entered the deal, and falsely stating that "[i]n respect of its 50% interest in the joint venture, [Company 1] agreed to pay [Iconix] $21.5 million." This was misleading because, as set forth above, Company 1 paid $15.5 million in consideration for the intellectual property assets, with the remaining $6 million representing an overpayment that Cole had promised to give back.

139.   The Iconix response letter misleadingly stated that the third quarter SEA III transaction was negotiated by Horowitz and another executive "with guidance from CEO, Neil Cole," when in reality, Cole played an instrumental role in negotiating SEA III, personally negotiating the overpayment and giveback terms.

140.   Cole specifically directed that his role in the deals be downplayed in the Iconix response letter.

24

141.    The SEC comment letter requested that Iconix describe its basis for the revenue it recognized from international joint venture transactions, including those at issue in this case. Iconix provided a justification for revenue recognition in the second quarter SEA II transaction that was false and misleading because it stated that Iconix recognized the gain from the SEA II transaction as revenue, while omitting that $5 million of this represented an overpayment that Cole had promised to return.  Similarly, Iconix provided a justification for the third quarter SEA III transaction that was false and misleading because it stated that Iconix recognized the gain from the SEA III transaction as revenue, while omitting that $6 million of this represented an overpayment that Cole had promised to give back.

142.    The SEC comment letter also requested that Iconix describe the material terms of its international joint venture transactions.  At Cole's direction, the descriptions in the Iconix response letter were false and misleading.

143.    Iconix provided a false and misleading description of the terms of the second quarter SEA II transaction, which omitted that the $15.9 million purchase price had been inflated by a $5 million overpayment that Cole had promised to give back.  Cole's promise to give $5 million back to Company 1 was omitted entirely.

144.    Similarly, Iconix provided a false and misleading description of the terms of the third quarter SEA III transaction, which omitted that the $21.5 million purchase price had been inflated by a $6 million overpayment that Cole had promised to give back.  Cole's agreement to return $6 million to Company 1 was omitted entirely.

145.    During the time period that Iconix was preparing its responses to the SEC comment letters, Cole also directed the destruction of documents and emails related to the joint venture transactions described in this Complaint.

146.    Cole gave this instruction in order to obstruct any investigation that might arise as a result of the Corporation Finance inquiry.

147.    As a consequence of Cole's instruction, both Cole and Horowitz deleted relevant emails related to Company 1 and the scheme set forth above.

**G.      Horowitz and Cole Resigned and Iconix Restated Its Financial Statements**

148.    In April of 2015, Horowitz resigned from Iconix.  In a letter to the Board of Directors announcing his resignation, Horowitz suggested that the Board examine certain accounting issues, including the SEA transactions.

149.    In August of 2015, Cole resigned all of his positions at Iconix.  Soon after, the Board of Directors announced that it had previously formed a Special Committee to examine the company's accounting practices.

150.    Beginning in November of 2015, Iconix announced what would become a series of restatements of its financial statements, which touched on a number of accounting errors and improprieties.  Among other things, the restatements involved consolidating into Iconix's books its international joint ventures, including the SEA joint venture, as amended under the SEA II and SEA III transactions, and the MENA joint venture, with the result that revenue recognized as part of the joint ventures was reversed.

**H.      Defendants Misled Accountants and Auditors**

151.    Cole and Horowitz each failed to disclose to accountants within Iconix the true nature of the SEA II and SEA III deals, and the promise to give millions of dollars in overpayments back to Company 1.  Through this failure, Iconix's accounting and finance personnel were incorrectly led to believe that the purchase prices recorded for the SEA II and SEA III deals were bona fide amounts that could be recognized as revenue.

152.    By failing to disclose that the $3.1 million MENA payment was not in fact for due diligence services, Cole also conveyed the false and misleading impression to Iconix's accounting and finance personnel that the $3.1 million due diligence payment was a legitimate business expense.

153.    Cole and Horowitz also withheld material information from Iconix's external auditors.  Even though Cole and Horowitz each met with members of Iconix's external auditor in the period of time after the SEA II and SEA III transactions and before the issuance of Iconix's audited annual report in March 2015, neither Cole nor Horowitz disclosed the inflated revenue and givebacks from the SEA II and SEA III deals, or the inflated revenue, net income, and non-GAAP diluted earnings per share that Iconix reported as a result.

154.    Cole also made false misrepresentations to Iconix's external auditors in management representation letters submitted to the auditors in connection with the preparation of Iconix's second and third quarter reports and 2014 annual report.

155.    To conduct its review of Iconix's quarterly filings and its audit of Iconix's annual report, the external auditor required Iconix management to submit a letter making certain representations relevant to the preparation of the company's financial results, including representations about the company's activities, internal controls over financial reporting, and accounting policies and judgments.

156.    On August 6, 2014, Iconix submitted to its external auditor a management representation letter that was signed by Cole and concerned the second quarter Form 10-Q.  In the letter, Cole represented that the financial results reported in the Form 10-Q were prepared in accordance with generally accepted accounting principles, that the company had an effective system of internal controls, that all relevant financial records and data had been made available

to the external auditor, and that management was not aware of fraud materially affecting the financial statement, fraud involving those involved in the company's internal controls, or allegations of fraud involving employees.

157.    As Cole knew, all of these representations were false, because the $5 million SEA II overpayment, and corresponding promise to give back $5 million to Company 1, had not been disclosed to the external auditor, and by counting the $5 million overpayment as revenue, Iconix had not prepared its financial results in accordance with GAAP.  Moreover, the fraud perpetrated by Cole and Horowitz had materially affected the financial results and involved officers of the company.

158.    On November 7, 2014, Iconix submitted to its external auditor a management representation letter that was signed by Cole and concerned the third quarter Form 10-Q.  In this management representation letter, Cole repeated the same representations as in the second quarter letter, which were false and misleading because of the concealment of the $6 million SEA III overpayment and Cole's corresponding promise to give $6 million back to Company 1. In addition, in this letter Cole made representations related to certain guaranteed payments featured in the SEA III deal.  Even though the letter specifically referred to the SEA III deal, it did not mention the fake revenue or secret, oral giveback promise.  Despite this omission, Cole signed the letter.

159.    Finally, on March 2, 2015, Iconix submitted to its external auditor a management representation letter that was signed by Cole and concerned the company's annual results and the 2014 Form 10-K.  In this letter, Cole repeated the representations that were common to the second and third quarter management representation letters.  These representations were false and misleading because they omitted any mention of the SEA II and SEA III round-trips.

## III.   DEFENDANTS RECEIVED MONEY OR PROPERTY AS A RESULT OF THEIR FRAUD

160.   The fictitious revenue that Iconix recognized in connection with the sham transactions had a material impact on the company's reported quarterly revenue and net income for the second and third quarters of 2014, and enabled Iconix to beat consensus estimates for annual revenue and non-GAAP diluted EPS in 2014.

161.   Based on these transactions, Iconix recorded $11 million in false revenue, which was material to its financial reporting and ability to beat consensus estimates in the second and third quarters of 2014, as well as at 2014 year-end.  Without the false revenue recorded, Iconix would have missed the consensus revenue estimates in both quarters and at the end of the year, and would have missed the consensus non-GAAP diluted EPS estimate for the year.

162.   Under the terms of their employment, for the year 2014 both Cole and Horowitz were entitled to substantial equity-based incentive compensation that would vest if the company achieved certain financial metrics for 2014.  The criteria for this compensation included achievement of certain milestones for Iconix's earnings before interest, taxes, depreciation, and amortization ("EBITDA"), and for its free cash flow, both of which factored in Iconix's reported revenue.  Both Cole and Horowitz received equity-based incentive compensation for 2014.  In addition, Cole received a substantial performance-based cash bonus for 2014.  Moroever, when Cole left the company in 2015, he received $2.75 million in severance as well as numerous Iconix shares and options.

163.   As a result of this fraud, Iconix stock also traded at inflated prices after Iconix made false disclosures in 2014.  During that time period, both Cole and Horowitz profited through sales of their Iconix shares.

164.    After Cole orchestrated the revenue recognition fraud set forth above, which enabled Iconix to boast of record revenues and earnings in the second and third quarters, he sold millions of dollars' worth of Iconix stock.

165.    On October 31, 2014, days after the press release falsely announcing the company's "record" revenue and earnings for the third quarter, Cole sold 1 million shares of Iconix stock, receiving proceeds of $39.51 million.  The sale represented a third of Cole's holdings in company stock, and was not made pursuant to an executive stock sale plan.

166.    On December 31, 2014, Cole sold 68,306 shares of Iconix stock, realizing over $2.3 million in tax relief.

167.    On March 5, 2015, shortly after the filing of the company's annual report, Cole sold 144,711 shares of Iconix stock, realizing over $4.9 million in tax relief.

168.    During the same period, Horowitz realized $605,122.66 in tax relief on three separate sales of Iconix stock.

## IV.    THIS ACTION IS TIMELY FILED

169.    Cole has entered into agreements with the SEC in which he agreed to toll, for various periods and lengths of time, any statute of limitations applicable to the conduct and claims alleged herein.  Cole's tolling agreements cover the periods from July 18, 2017, through July 18, 2018, and from August 3, 2019, through December 10, 2019, meaning those periods are excluded from any calculation of the statute of limitations.  As a result, this action is timely filed as to Cole.

170.    Horowitz has entered into agreements with the SEC in which he agreed to toll, for various periods and lengths of time, any statute of limitations applicable to the conduct and claims alleged herein.  As a result, this action is timely filed as to Horowitz.

## CLAIMS

### FIRST CLAIM FOR RELIEF

**(Against Cole and Horowitz for Violations of Section 10(b) of the
Exchange Act and Rules 10b-5(a) and (c) Thereunder)**

171.    Paragraphs 1 through 170 are realleged and incorporated by reference as if fully
set forth herein.

172.    By reason of the conduct described above, Cole and Horowitz, in connection with
the purchase or sale of a security, by the use of means or instrumentalities of interstate
commerce, of the mails, or of the facilities of a national securities exchange, directly or
indirectly: (a) used or employed devices, schemes, or artifices to defraud; and (c) engaged in
acts, practices, or courses of business which operated or would operate as a fraud or deceit upon
other persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule
10b-5 thereunder [17 C.F.R. § 240.10b-5].

173.    Specifically, Cole and Horowitz engaged in a scheme to manufacture fictitious
revenue to manipulate certain financial metrics for Iconix, with the result that Iconix reported
false financial results in its second quarter, third quarter, and annual reports for 2014, and made
false and misleading statements and omissions concerning the SEA II and SEA III deals in those
reports, in addition to the quarterly report for the first quarter of 2015.  Cole and Horowitz
structured and negotiated round-trip transactions and worked to conceal giveback payments to
Company 1.

174.    While engaging in the conduct described above, Cole and Horowitz acted
knowingly or recklessly.  Their scienter is evidenced by, among others things, their concealment
of material information from accountants and auditors, their attempts to procure invoices that

would not arouse suspicion, their use of false statements to the SEC's Division of Corporation Finance, and their destruction of evidence.

175.    By engaging in the conduct described above, Cole and Horowitz violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

**(Against Cole for Violations of Exchange Act Rule 10b-5(b))**

176.    Paragraphs 1 through 170 are realleged and incorporated by reference as if fully set forth herein.

177.    By reason of the conduct described above, Cole, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly: (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

178.    Specifically, Cole and Horowitz engaged in a scheme to manufacture fictitious revenue in order to manipulate certain financial metrics for Iconix, with the result that Iconix reported false financial results in its second quarter, third quarter, and annual reports for 2014, and made false and misleading statements and omissions concerning the SEA II and SEA III deals in those reports, in addition to the quarterly report for the first quarter of 2015, which Cole also signed.  Cole similarly made false and misleading statements and omissions in Iconix's earnings releases.

179.    While engaging in the conduct described above, Cole acted knowingly or recklessly.  Cole's scienter is evidenced by, among others things, his concealment of material information from accountants and auditors, his attempts to procure invoices that would not arouse suspicion, his use of false statements to the SEC's Division of Corporation Finance, and his destruction of evidence.

180.    By engaging in the conduct described above, Cole violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### (Against Cole and Horowitz for Violations of Section 17(a) of the Securities Act)

181.    Paragraphs 1 through 170 are realleged and incorporated by reference as if fully set forth herein.

182.    By reason of the conduct described above, Cole and Horowitz, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

183.    Specifically, Cole and Horowitz engaged in a scheme to manufacture fictitious revenue to manipulate certain financial metrics for Iconix, with the result that Iconix reported false financial results in its second quarter, third quarter, and annual reports for 2014, and made

false and misleading statements and omissions concerning the SEA II and SEA III deals in those

reports, in addition to the quarterly report for the first quarter of 2015.  Cole and Horowitz

structured and negotiated round-trip transactions and worked to conceal giveback payments to

Company 1.

184.    While engaging in the conduct described above, Cole and Horowitz acted

knowingly, recklessly, or negligently.  This is evidenced by, among others things, their

concealment of material information from accountants and auditors, their attempts to procure

invoices that would not arouse suspicion, their use of false statements to the SEC's Division of

Corporation Finance, and their destruction of evidence.

185.    By engaging in the conduct described above, Cole and Horowitz violated, and

unless restrained and enjoined will again violate, Sections 17(a) of the Securities Act [15 U.S.C.

§§ 77q(a)(1), (2), (3)].

## FOURTH CLAIM FOR RELIEF

**(Against Cole and Horowitz for Aiding and Abetting Iconix's Violations of Section 13(a) of
the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder)**

186.    Paragraphs 1 through 170 are realleged and incorporated by reference as if fully

set forth herein.

187.    By reason of the conduct described above, Iconix violated Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17

C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].   Cole and Horowitz knowingly or

recklessly provided substantial assistance that aided and abetted Iconix's violation of Section

13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

188.    Specifically, Cole and Horowitz engaged in a scheme to manufacture fictitious

revenue in order to manipulate certain financial metrics for Iconix, with the result that Iconix

reported false financial results in its second quarter, third quarter, and annual reports for 2014, and made false and misleading statements and omissions concerning the SEA II and SEA III deals in those reports, in addition to the quarterly report for the first quarter of 2015. Cole and Horowitz structured and negotiated round-trip transactions and worked to conceal giveback payments to Company 1.

189.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Cole and Horowitz are liable for those violations.

## FIFTH CLAIM FOR RELIEF

### (Against Cole and Horowitz for Violating Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder)

190.     Paragraphs 1 through 170 are realleged and incorporated by reference as if fully set forth herein.

191.     By reason of the conduct describe above, Cole and Horowitz, directly or indirectly, knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified, or caused to be falsified, books, records, or accounts that Iconix was required to maintain under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

192.     Specifically, Cole and Horowitz engaged in a scheme to manufacture fictitious revenue to manipulate certain financial metrics for Iconix, with the result that Iconix reported false financial results in its second quarter, third quarter, and annual reports for 2014, and made false and misleading statements and omissions concerning the SEA II and SEA III deals in those reports, in addition to the quarterly report for the first quarter of 2015. Cole and Horowitz structured and negotiated round-trip transactions and worked to conceal giveback payments to Company 1. In carrying out this scheme, Cole and Horowitz caused the deal documentation to

35

reflect inflated purchase prices and to omit the secret side deals whereby Cole had promised to give millions back to Company 1, thereby falsifying books and records and circumventing internal controls related to properly recording transactions.  As the intended results of their scheme, Cole and Horowitz caused Iconix to improperly account for the transactions in the company's accounts by recognizing millions in bogus revenue, resulting in erroneously inflated revenue, net income, and non-GAAP diluted EPS.  In circumvention of the company's system of internal controls, Cole and Horowitz misled accountants and auditors, and Cole signed the false financial statements, signed false certifications, and made false management representations to the company's external auditors.

193.    By engaging in the conduct described above, Cole and Horowitz violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## SIXTH CLAIM FOR RELIEF

**(Against Cole and Horowitz for Aiding and Abetting Iconix's Violation of Section 13(b)(2)(A) an 13(b)(2)(B) of the Exchange Act)**

194.    Paragraphs 1 through 170 are realleged and incorporated by reference as if fully set forth herein.

195.    By reason of the conduct described above, Iconix violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) and (b)(2)(b)].  By reason of the conduct described above, Cole and Horowitz knowingly or recklessly provided substantial assistance to and thereby aided and abetted Iconix's violations of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) and (b)(2)(b)].

196.    Specifically, Cole and Horowitz engaged in a scheme to manufacture fictitious revenue to manipulate certain financial metrics for Iconix, with the result that Iconix reported

false financial results in its second quarter, third quarter, and annual reports for 2014, and made

false and misleading statements and omissions concerning the SEA II and SEA III deals in those

reports, in addition to the quarterly report for the first quarter of 2015.  Cole and Horowitz

structured and negotiated round-trip transactions and worked to conceal giveback payments to

Company 1.  In carrying out this scheme, Cole and Horowitz caused the deal documentation to

reflect inflated purchase prices and to omit the secret side deals whereby Cole had promised to

give millions back to Company 1, thereby falsifying books and records and circumventing

internal controls related to properly recording transactions.  As the intended results of their

scheme, Cole and Horowitz caused Iconix to improperly account for the transactions in the

company's accounts by recognizing millions in bogus revenue, resulting in erroneously inflated

revenue, net income, and non-GAAP diluted EPS.  In circumvention of the company's system of

internal controls, Cole and Horowitz misled accountants and auditors, and Cole signed the false

financial statements, signed false certifications, and made false management representations to

the company's external auditors.

197.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)],

Cole and Horowitz are liable for those violations.

## SEVENTH CLAIM FOR RELIEF

### (Against Cole and Horowitz for Violating Exchange Act Rule 13b2-2)

198.    Paragraphs 1 through 170 are realleged and incorporated by reference as if fully

set forth herein.

199.    By reason of the conduct described above, Cole and Horowitz, while acting as

officers of Iconix, directly or indirectly, (i) made or caused to be made materially false or

misleading statements to an accountant; or (ii) omitted to state, or caused another person to omit

to state, material facts necessary in order to make statements made, in light of the circumstances

under which such statements were made, not misleading, to an accountant in connection with (1) any audit, review or examination of the financial statements of the issuer required by the Exchange Act or rules thereunder; or (2) the preparation or filing of any document or report required to be filed with the SEC pursuant to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)], or otherwise.

200.    Specifically, Cole and Horowitz engaged in a scheme to manufacture fictitious revenue to manipulate certain financial metrics for Iconix, with the result that Iconix reported false financial results in its second quarter, third quarter, and annual reports for 2014, and made false and misleading statements and omissions concerning the SEA II and SEA III deals in those reports, in addition to the quarterly report for the first quarter of 2015.  Cole and Horowitz structured and negotiated round-trip transactions and worked to conceal giveback payments to Company 1.  Cole and Horowitz misled accountants and auditors by concealing the true nature of the SEA II and SEA III transactions.  Cole also signed the false financial statements, signed false certifications, and made false management representations to the company's external auditors.

201.    By engaging in the conduct described above, Cole and Horowitz violated, and unless restrained and enjoined, will continue to violate Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

### EIGHTH CLAIM FOR RELIEF

**(Against Cole for Violating Exchange Act Rule 13a-14)**

202.    Paragraphs 1 through 170 are realleged and incorporated by reference as if fully set forth herein.

203.    Rule 13a-14 of the Exchange Act requires that each principal executive and principal financial officer of an issuer, at the time of filing a report, must sign a certification at the time of filing averring, among other things, that the report does not contain any untrue

statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report, and certifying certain matters as to the preparation of the company's financial results and its internal controls over financial reporting.  By reason of the conduct described above, Cole, as the Chief Executive Officer of Iconix, signed such certifications on August 6, 2014, on Iconix's Form 10-Q for the period ending June 30, 2014; on November 7, 2014, on Iconix's Form 10-Q for the period ending September 30, 2014; on March 2, 2015, on Iconix's Form 10-K for the period ending December 31, 2014; and on May 8, 2015, on Iconix's Form 10-Q for the period ending March 31, 2015, in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 [17 C.F.R. § 240.13a-14], promulgated thereunder.  Each certification was false because Cole represented that (1) the report did not contain any untrue statement or omission of a material fact necessary to make the statements not misleading in light of the circumstances in which they were made, and (2) the financial statements in the report fairly presented in all material respects the financial condition and results of the operations of Iconix.  At the time he signed each certification, Cole was aware that the accompanying report contained material misstatements and omissions.

204.    While engaging in the conduct described above, Cole acted knowingly or negligently.

205.    By engaging in the conduct described above, Cole violated, and unless restrained and enjoined, will again violate, Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

### NINTH CLAIM FOR RELIEF

**(Against Cole for Violation of Section 304 (a) of the Sarbanes-Oxley Act of 2002)**

206.    Paragraphs 1 through 170 are realleged and incorporated by reference as if fully set forth herein.

207. Iconix, through the conduct of Cole forth above, filed Forms 10-Q for the second and third quarters of 2014, and a Form 10-K for the fiscal year 2014, that were in material non-compliance with financial reporting requirements under the securities laws.

208. Iconix's material non-compliance with its financial reporting requirements under the securities laws was the result of Cole's misconduct that was designed to result in the fraudulent recognition of revenue from the sham overpayments from Company 1, which did not constitute valid revenue because Cole had promised to give the funds back to Company 1.

209. Due to Iconix's material non-compliance with its financial reporting requirements under GAAP, as a result of Cole's misconduct, Iconix materially misstated its publicly filed financial reports and was required to prepare a restatement covering, among other things, the second and third quarters of 2014 and the fiscal year 2014.

210. During the twelve-month period following Iconix's filings of fraudulent Forms 10-Q for the second and third quarters of 2014, and of Iconix's filing of the fraudulent Form 10-K for the fiscal year 2014, Cole received millions of dollars in base salary, cash bonus, equity-based incentive compensation, severance payments, and other stock-based compensation. While Cole returned some money to Iconix, he has not fully reimbursed Iconix for the above amounts.

211. The Commission has not exempted Cole, pursuant to Sarbanes-Oxley Section 304(b) [15 U.S.C. § 7243(b)], from the application of Sarbanes-Oxley Section 304(a) [15 U.S.C. § 7243(a)].

212. By engaging in the conduct described above, Cole violated, and unless ordered to comply will continue to violate, Sarbanes-Oxley Section 304(a) [15 U.S.C. §7243(a)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Securities and Exchange Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding that Defendants Cole and Horowitz violated the statutes and rules set forth in the Complaint as to each.

### II.

Permanently enjoining Defendants Cole and Horowitz, and all persons in active concert or participation with them, from violating the foregoing statutes and rules.

### III.

Ordering Defendants Cole and Horowitz to disgorge all ill-gotten gains and illegal losses avoided as a result of their unlawful conduct, plus prejudgment interest.

### IV.

Ordering Defendants Cole and Horowitz to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### V.

Issuing a judgment, in a form consistent with Fed. R. Civ. P. 65(d), ordering Cole to reimburse Iconix for his stock sales, bonus, and other incentive-based compensation, pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002, 15 U.S.C. §7243.

### VI.

Ordering that Defendants Cole and Horowitz each be barred from acting as officers or directors of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. §

77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VII.

Granting such other and further equitable relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands trial by jury.

Dated: December 5, 2019

Respectfully submitted,

By:

Thomas A. Bednar*
Fernando Campoamor Sanchez*
Sarah H. Concannon (SDNY #SC-9111)

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Telephone:  (202) 551-6218 (Bednar)
Facsimile:  (202) 772-9292
Email:  BednarT@sec.gov

*Attorneys for Plaintiff Securities and
Exchange Commission*

* *pro hac vice* application pending

Of Counsel:

Danette R. Edwards
Gregory G. Faragasso
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549